AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
01/25/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ____AP____ DEPUTY

United States of America

v.

David ALVAREZ-BLAS,

Defendant

Case No. 5:25-mj-00026

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 23, 2025 in the County of San Bernardino in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(5) | Alien in Possession of a Firearm |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Jorge Palomo, Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: Jan. 25, 2025

*Karen L. Stevenson*
*Judge's signature*

City and state: Los Angeles, California

Hon. Karen L. Stevenson,
Chief U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander H. Tran (x0758)

**AFFIDAVIT**

I, Jorge Palomo, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against David ALVAREZ-BLAS ("ALVAREZ-BLAS") for a violation of 18 U.S.C. § 922(g)(5): Alien in Possession of a Firearm.

2. This affidavit is also made in support of an application for a warrant to search a Black Samsung, Smart Phone, SN: R3CR50A8WZY, in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A (the "SUBJECT DEVICE").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g) (Prohibited Person in Possession of a Firearm) and 8 U.S.C. § 1326 (Alien Found in the United States Following Deportation) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a United States Border Patrol Agent ("BPA") with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal BPA with the USBP since September 2009, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico. The 23-week Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, Controlled Substances law, and in Title 19, United States Code, Customs law.

## III. SUMMARY OF PROBABLE CAUSE

6. On January 23, 2025, ALVAREZ-BLAS was driving on the I-40 freeway and was stopped by USBP agents. USBP agents learned that ALVAREZ-BLAS was unlawfully in the United States. Following a search of ALVAREZ-BLAS's vehicle, USBP agents recovered a Glock, model 19, 9mm caliber firearm and two magazines with a total of 14 rounds of ammunition. USBP agents also recovered the SUBJECT DEVICE from ALVAREZ-BLAS's vehicle.

7. An ATF special agent examined photos of the Glock, model 19, and determined that it was transported in interstate commerce. Furthermore, a review of ALVAREZ-BLAS's background

confirmed that he was an alien unlawfully present in the United States after having been previously removed from the country.

### IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   January 23, 2025 Traffic Stop of ALVAREZ-BLAS**

9. On January 23, 2025, at approximately 7:35 p.m., BPA J. Goodman encountered a black 2017 Ford Explorer with a New Mexico license plate (***36US) traveling eastbound on I-40. Based on his training and experience, BPA Goodman was aware that I-40 was a known corridor used by smuggling organizations to avoid detection and transport illicit contraband throughout the United States. BPA Goodman was informed, from law enforcement investigative resources, that this New Mexico license plate was previously associated with a human smuggling incident in New Mexico.

10. After encountering the vehicle, BPA Goodman observed the vehicle make several abrupt lane changes and constantly and dramatically changed its speed. He observed the vehicle speed up and slow down several times. BPA Goodman also observed a law enforcement "blue line" sticker next to the vehicle's license plate. BPA Goodman also observed a United States Navy sticker on the vehicle. Based on his training and experience, BPA Goodman was aware that that these types of stickers are often used to deter law enforcement from further investigating

suspicious activity because these stickers seemingly represent support for law enforcement.

11. BPA Goodman continued to follow the vehicle and advised BPAs L. Olivares and J. Osborne of his observations. At approximately 7:45 p.m., BPA Goodman conducted a vehicle stop and the vehicle yielded approximately 2 miles east of the Newberry Springs Rd. exit in Barstow, California.

12. BPA Goodman approached the vehicle and identified himself as a Border Patrol Agent. BPA Goodman observed the driver (later identified as ALVAREZ-BLAS) and front passenger and a female passenger in the backseat.

13. BPA Goodman asked the individuals about their citizenship. The front passenger and the backseat female passenger stated that they were citizens of Mexico. BPA Goodman asked them if they possessed proper immigration documents to legally be present in the United States. Both stated that they did not.

14. The driver, ALVAREZ-BLAS, stated that he was a United States citizen and provided the BPAs with a New Mexico driver's license. The BPAs conducted an immigration history records check and learned that ALVAREZ-BLAS was previously deported from the United States in 2014. The record checks also revealed that ALVAREZ-BLAS was last removed from the United States in 2024.

15. BPA Goodman asked ALVAREZ-BLAS about his deportation orders, and ALVAREZ-BLAS admitted to being a citizen of Mexico unlawfully present in the United States. BPA Goodman placed all passengers under arrest.

16. During an inventory search of the vehicle,[1] USBP discovered a Glock 19 handgun in a tactical style tan bag in the third row of the vehicle. The Glock 19 had a magazine inserted in the magazine well and it did not have a round in the chamber. A second loaded magazine was also located inside the tan bag. A large amount of U.S. currency was also found in an envelope inside the center console. The SUBJECT-DEVICE was located on a cell phone stand within the center console cup holder. The individuals in the vehicle, the Glock 19, ammunition, U.S. currency, and SUBJECT DEVICE were transported to the Indio Border Patrol Station for further interviews and processing.

**B.   ALVAREZ-BLAS Admitted to Possessing the Firearm**

17. Based on my review of law enforcement reports and recordings, I am aware that on January 23, 2025, at approximately 11:52 p.m. at the Indio Border Patrol Station in Indio, California, ALVAREZ-BLAS was advised of his Miranda rights in Spanish. ALVAREZ-BLAS stated that he understood his rights and agreed to answer questions without the presence of an attorney. ALVAREZ-BLAS also signed a written form waiving his Miranda rights.

18. In a recorded and Mirandized interview, ALVAREZ-BLAS stated, in substance, the following:

   a.   ALVAREZ-BLAS was from Mexico City, Mexico, and he is currently living in Hatch, New Mexico, where he is currently employed and works in the fields picking crops.

---

[1] I know that the vehicle was towed after the passengers were arrested. ALVAREZ-BLAS was not the registered owner of the vehicle.

5

  b. ALVAREZ-BLAS does not possess legal documents to be in or enter the United States legally.

  c. ALVAREZ-BLAS admitted that the Glock 19 belongs to him and that he purchased the weapon on December 15, 2024, from an unknown man in El Paso, Texas for approximately $200.

  d. ALVAREZ-BLAS stated that he purchased the Glock 19 for self-defense after a group of armed men from the mafia threatened him and his family at his home.

  e. ALVAREZ-BLAS stated that he has prior military experience in Mexico and knowns how to handle weapons.

  f. ALVAREZ-BLAS stated that he purchased 9mm ammunition for the firearm at an unknown store.

  **C. ALVAREZ-BLAS is a Mexican Citizen and Has Previously Been Removed from the United States**

 19. On January 24, 2025, I reviewed immigration documents for ALVAREZ-BLAS and learned that ALVAREZ-BLAS is a Mexican citizen who was previously removed from the United States in or about 2014 and 2024.  Thus, I know that when ALVAREZ-BLAS was encountered in the Central District of California on January 24, 2025, he likely reentered the country after having been previously removed from the United States.

 20. From my training and experience, I have learned that phones such as the SUBJECT DEVICE have the capability to track a user's location through their Location Services feature.  If the feature has not been disabled, it can show a map of significant locations that the user has visited.  From my training and experience, I know that individuals who commit illegal reentry

6

frequently carry their cellphones with them during the crime. In addition, based on my training and experience, I know that phones such as the SUBJECT DEVICE often have data and records relevant to the user's presence in the United States.

### D.   The Firearm Traveled In and Affected Interstate Commerce

21.  From my discussions with law enforcement personnel and review of reports, I know that on or about January 23, 2025, ATF Special Agent Paul Kirwan -- who is trained in analyzing firearms -- examined a photograph of the Glock 19 recovered from ALVAREZ-BLAS's vehicle.  SA Kirwan determined that the firearm was manufactured outside California.  Because the firearm was recovered in California, I believe it has traveled in and affected interstate commerce.

### V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

22.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

   a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other

7

individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

      b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c.   Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23.   As used herein, the term "digital device" includes the SUBJECT DEVICE.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

9

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.  <u>CONCLUSION</u>

27.    For all of the reasons described above, there is probable cause to believe that ALVAREZ-BLAS has committed a violation of 18 U.S.C. § 922(g)(5): Alien in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __25th__ day of January, 2025.

*Karen L. Stevenson*
_____
HONORABLE KAREN L. STEVENSON
CHIEF UNITED STATES MAGISTRATE JUDGE

11